HIGHWAY INS. UNDERWRITERS

v.

SMYRL.

No. 10209.

Court of Civil Appeals of Texas.

Austin.

April 14, 1954.

Rehearing Denied April 28, 1954

Paul Petty, Ballinger, Strasburger, Price, Kelton, Miller & Martin, Fred K. Newberry, Royal H. Brin, Jr., Dallas, for appellant.

J. Ray Martin, Snyder, for appellee.

HUGHES, Justice.

This is a Workmen's Compensation suit in which G. V. Smyrl, the employee of Baygent Coaches, recovered judgment against Highway Insurance Underwriters, Baygent's insurer, for permanent and total disability.

The insurance company appeals and presents two points of error, the first being addressed to the refusal of the trial court to hold, as a matter of law, that appellee did not have good cause for not filing his claim for compensation within the time prescribed by statute, Vernon's Ann.Civ.St. art. 8307, § 4a, and which continued until it was actually filed and the second point being an asserted material conflict in the answers of the jury to special issues submitted to it.

In determining the first point we are required to set out the evidence at length. There is no other way in which our opinion may fairly reflect our decision on this question.

Appellee's injury was sustained about November 1, 1950, in Ballinger, Texas as a result of lifting a suitcase. His claim for compensation was filed February 5, 1952.

"Good cause" as found by the jury is shown by its affirmative answer to the following special issue:

"Do you find from a preponderance of the evidence that the doctors treating G. V. Smyrl at times after he lifted the suit case on the occasion in question, if he did so, and before he filed his claim, caused him to believe that his incapacity, if any, was not a natural result of his lifting of such suit case?"

Appellee, who was 41 years old when injured, had earned his livelihood mostly in farming, ranching and driving trucks, buses and taxicabs. In 1948 he suffered from stomach ulcers and was seriously ill. He consulted a Doctor Miller in the Medical Arts Building in Dallas, several doctors in Snyder, including a Dr. Redwine. In May 1949 he was operated by a Doctor Mast in Lubbock and a part of his stomach was removed. He failed to regain complete good health following this operation and after working a while went back to bed in November 1949. In February 1950[1] he went to John Sealy Hospital in Galveston and was reoperated there in March and more of his stomach was removed. The attending physicians were Drs. Kaufman, Roe and Singleton.

Recovery from this operation was excellent and appellee returned to work in May and in September was employed by Baygent Coaches for whom he worked until about November 19, nineteen days after his injury.

Appellee was injured when, in the course of his duties as driver of a Baygent Coaches bus, he attempted to pick up a suitcase weighing about 55 or 60 pounds. As he testified a "pain hit me in the side * * * caught me in here, and I just dropped it, and the other driver went ahead and loaded it and I went on * * * I felt like I had a catch in my side, what it felt like, caught me and drawed me over; felt like a bad catch, a cramp or something. * * *" The pain eased somewhat and appellee continued working. However in a few days he wrote his employer telling him "I hurt my side and my side was giving me trouble and I needed some relief * * * another driver * * *." This letter was not answered and on the 12th of November appellee wired Baygent that he was quitting on the 15th of November. Mrs. Baygent then telephoned appellee and asked him to stay on until the 20th, which he did.

On the 16th of November, appellee went to see a Dr. Crymes and after telling him about lifting the suitcase and of his physical condition the Doctor,

"Well, he put me on a—well, he first put me on the table, pulled my shirt off and examined me and then he put me on the table and turned the heat light on me, give me that heat treatment for a good while, and when he got done with that he gave me a bunch of bandeine tablets, told me, says, 'that is the latest on ulcerated stomach; if they don't do you any good needn't come back to me.'"

Appellee asked Dr. Crymes whether picking up the suitcase was the cause of his pain and received no answer.

Appellee took the pills prescribed by Dr. Crymes at the rate of three a day for several days concerning which he testified:

"Q. At that time what did you understand you were taking those for? A. Ulcerated stomach.

* * * * * *

"Q. Mr. Smyrl, at that time did you believe, state whether or not you believe you were suffering from ulcers? A. Well, I believed I was, yes, by him giving me that."

1. All subsequent dates are 1950 unless otherwise indicated.

On the 23rd day of November appellee consulted a Dr. Broadus at Snyder who, after an examination, advised him to return to John Sealy Hospital in Galveston concerning which advice appellee testified:

"Q. And will you state whether or not from that you believed that it was your old condition of your stomach and operations again? A. Yes, I did."

About December 1, appellee returned to John Sealy Hospital in Galveston and was examined by several doctors. He was there advised to return home and rest for 60 to 90 days and that he would then be all right. Regarding this hospitalization appellee testified:

"Q. Did they tell you what was wrong with you? A. No, they didn't."

This statement was somewhat modified on cross examination as follows:

"Q. And I believe you testified in your deposition that the doctor in Galveston told you you might have torn something loose? A. I told him about lifting a suit case; he said, you might have torn something loose; if you will go back home and rest 60 or 90 days you will be all right.

*    *    *    *    *    *

"Q. About a month after this happened you went to Galveston and they told you you might have torn something loose, is that your testimony? A. That's my testimony.

"Q. You didn't pursue it any further, did you; I mean, you didn't ask him questions about it, did you? A. No, there wasn't much questions asked. He told me what he thought was the matter.

"Q. Did you file any claim for receiving an injury at that time? A. No. Mr. Baygent didn't send me no claim.

*    *    *    *    *    *

"Q. Well, now, when you went home did you think anything about what the doctor had told you about having pulled something loose, maybe? A. No, I was thinking about getting well. He told me I would be well.

"Q. They also told you you might have torn something loose? A. I kept holding out about the suit case. He said, you might have pulled something loose.

*    *    *    *    *    *

"Q. You told them before? A. They asked me how it started.

"Q. And told him it started when you picked up the suit case? A. Yes.

"Q. * * * What was your reason for not filing a claim? A. Because I didn't know I had an injury.

"Q. Hadn't Dr. Singleton told you you might have? A. He told me that I might have, yes.

*    *    *    *    *    *

"Q. You don't know of any way Dr. Singleton told you you might have torn something loose; how did he mislead you? A. He didn't tell me I did or didn't.

"Q. That mislead you. A. It did to a certain extent.

"Q. To what extent? A. Well, I still didn't know what was the matter with me, * * *."

Appellee returned home and, as directed, rested until about March 1, 1951, when his health not being improved, he returned to the hospital in Galveston when he was examined for four days and, being very sick, wired his brother-in-law to come after him and he then returned to Snyder. He was advised by the doctors in Galveston to return for further examination but he did not do this. After filing his claim and at the request of the insurance carrier appellee went to Dr. Dunn in Snyder —also he was sent to Dr. Snow in Abilene

and to Dr. Redwine in Snyder by his attorney.

Appellee went to see an attorney and on the same day filed his claim for compensation. Regarding this he testified:

"Q. * * * The information you gave to your attorney was the same information, medical information you had had ever since June before, wasn't it? A. Yes, I told him how everything was.

"Q. Really and truly, was it your attorney that convinced you you had an accident out there causing your disability? A. He told me if I had hurt my side and aggravated my old trouble I ordinarily had a claim coming.

"Q. You knew that, didn't you? A. No, I didn't.

"Q. You knew that all along? A. I didn't. If I had ulcers I don't know it.

"Q. What made up your mind— you didn't say in that claim you filed on February 2nd, you didn't say a word about ulcers, did you? A. I just told him what the doctors told me.

*    *    *    *    *    *

"Q. What suddenly made you make up your mind that suit case was what strained you? A. I just went up and told him how everything was, what the doctors told me; I didn't have money and couldn't do anything and I was suffering. I was wondering if that was the cause. I thought I would get somebody behind it that knowed something about it.

"Q. You were wondering if that was the cause of it? A. Yes, I got to wondering.

"Q. When did you get to wondering? A. Along in December.

"Q. In December; it wasn't until December that—you are trying to tell this Jury it wasn't until December of 1951 that you got to wondering whether or not that lifting that suit case caused your condition? A. That's right.

"Q. Hadn't Dr. Singleton told you it might have caused it nine months before? A. He told me I might have pulled a little tissue loose.

"Q. Well, now, didn't you get to wondering back in March of '51 whether or not that might have caused it? A. No, I didn't, because I never did draw insurance; I didn't know nothing about it.

"Q. Did you ever ask Baygent to send you to Doctors before going to a lawyer or ask him about any insurance claims, or anything like that? A. I wrote to him, told him what I did. He didn't offer to send me.

*    *    *    *    *    *

"Q. It wasn't until you went to your lawyer, Martin, February 2nd you finally set it down on paper, says, By Golly, I hurt myself 17 months ago lifting that grip; is that your testimony here? A. He told me hurting my side could cause another ulcer, and if it was an aggravation, he knew if I had an ulcer, what they were doctoring me for, I didn't have no claim. I didn't know if I tore something loose could cause an ulcer.

"Q. Did you ask these other doctors about that; did you ask Dr. Broadus about it? A. I went in for examination.

"Q. Did you ask Broadus whether tearing something loose could cause an ulcer? A. No, I didn't.[2]

*    *    *    *    *    *

"Q. Did Martin convince you you had a claim for compensation, is that

2. Similar question and answers are shown as to Doctors Crymes, Singleton and Redwine.

it?' A. He said if I hurt my side and aggravation of my old trouble I would have one coming, yes.

"Q. Is that the reason you didn't file a claim before? A. Part of the reason.

"Q. What is the other part? A. Because I didn't know I was injured.

"Q. Didn't know you were injured; did Martin convince you you were injured? A. Well, I kept getting worse and worse. I decided I was injured.

"Q. When did you decide that? A. Just before I went to him."

The pain which appellee suffered when he lifted the suitcase was the first he had suffered in several months. It was a "new" pain, on his left side whereas his ulcer pains had been on the right. The pain was severe and caused appellee to walk slightly stooped.

The question presented is difficult and one in the decision of which adjudicated cases, because of dissimilar facts, are not very helpful.

■ We are guided by these rules:

"The term 'good cause' for not filing a claim for compensation is not defined in the statute, but it has been uniformly held by the courts of this state that the test for its existence is that of ordinary prudence, that is, whether the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances. Consequently, whether he has used the degree of diligence required is ordinarily a question of fact to be determined by the jury or the trier of facts. It may be determined against the claimant as a matter of law only when the evidence, construed most favorably for the claimant, admits no other reasonable conclusion."[3]

■ When we consider the evidence as a whole we are unable to say that there is no evidence in support of the jury's finding of good cause.

The record reflects the utmost of good faith on the part of appellee during the course of this incident. He frankly disclosed to his employer and the several doctors who examined him all he knew about his medical history, physical condition and the possible cause of his pain and suffering and of all the doctors who attended him following his injury and prior to filing claim none advised or informed him categorically that the "catch" in his side sustained when he lifted the suitcase was the cause of his trouble.

Should appellee, as a prudent person have known this when skilled physicians apparently did not? Of course if an employee falls and breaks his leg he must know that the fall caused the break. Here, however, we have an internal disorder resulting from a seemingly harmless physical act of lifting a suitcase weighing no more than sixty pounds. We believe that considering appellee's previous serious operations for an ulcerated stomach, his meager education, the reticence of the doctors with whom he consulted and the patently misleading treatment for ulcers and trivial incident with which his accident was associated that appellee was not bound to know, as a matter of law, that lifting the suitcase was the cause of his injury and this even though a doctor in Galveston told him that such act "might have pulled something loose." "Might have" testimony from an expert is very feeble in the courtroom and should not, in our opinion, be conclusive here against appellee's claim of good cause for delay in filing his claim.

The conflict in issues is said to be between Issue No. 4 which found that appellee gave notice to his employer within thirty days of the date of injury that he had sustained such an injury and Issue No. 17 finding that appellee did not know

3. Hawkins v. Safety Casualty Co., 146 Tex. 381, 207 S.W.2d 370, 372.

for six months following his injury that he had sustained an injury.

These are parallel not conflicting findings. Both issues support a judgment ·for appellee. Neither supports a judgment · for appellant. There is no conflict of issues within the test prescribed by the Supreme Court in Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 ·S.W.2d 985.

The judgment of the trial court is affirmed.